John Eldon SMITH, Petitioner-Appellant,

v.

Ralph M. KEMP, Superintendent, Georgia Diagnostic & Classification Center, Respondent-Appellee.

No. 83–8611.

United States Court of Appeals, Eleventh Circuit.

Sept. 9, 1983.

Rehearing and Rehearing En Banc Denied Sept. 29, 1983.

Certiorari Denied Nov. 28, 1983. See 104 S.Ct. 510.

See also 250 Ga. 645, 301 S.E.2d 32.

John Charles Boger, New York City, Timothy K. Ford, Seattle, Wash., for petitioner-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before RONEY, HILL and HATCHETT, Circuit Judges.

RONEY and JAMES C. HILL, Circuit Judges:

Joseph Ronald Akins and his wife of twenty days, Juanita Knight Akins, were killed in a secluded area of a new housing development in Bibb County, Georgia, on August 31, 1974, by shotgun blasts fired at close range. Petitioner, John Eldon Smith, also known as Tony Machetti, charged with firing the shotgun, was convicted of murder and sentenced to death.

Briefly, the evidence was that petitioner and his wife, Rebecca Akins Smith Machetti, together with John Maree, plotted to kill Akins, a former husband of Rebecca's and the father of her three children, in order to collect his life insurance proceeds. John Maree testified that he and petitioner lured Akins to the area of the crime on the pretense of installing a television antenna. When Akins appeared with his wife, petitioner shot them both.

Before this Court is the appeal from a denial of a second federal habeas corpus petition that asserted three grounds for relief: *first,* John Maree had a pretrial agreement or understanding not revealed to the jury so that the trial was unconstitutional under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *second,* the Georgia death statute is applied in an unconstitutional, arbitrary, and discriminatory way; and *third,* the underrepresentation of women made the jury that convicted him unconstitutional under *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

We affirm the denial of habeas corpus relief holding *first,* the *Giglio* claim, although not asserted in the prior federal habeas corpus proceeding, was resolved by a state court's finding of fact that there was no understanding or agreement that should have been revealed to the jury; *second,* that defendant had a full opportunity to litigate and did litigate in his prior habeas corpus proceeding the issue concerning the arbitrary and discriminatory application of Georgia's death penalty to petitioner, so that the attempt to relitigate here is a clear abuse of the writ; and *third,* the defendant waived his right to object to the jury by failing to assert the issue at trial, on appeal, or in his first habeas corpus proceeding.

Petitioner's execution was scheduled for August 25, 1983. A notice of appeal was filed in this Court on Monday, August 22, from a denial of the relief by the district court entered on Friday, August 19. A motion for stay of execution was simultaneously filed, along with a motion for certificate of probable cause. Both motions were denied by the district court.

Following the procedures indicated by *Barefoot v. Estelle,* —— U.S. ——, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), this Court gave proper notice that the Court would consider the merits as well as the pending motion and heard two and one-half hours of oral argument on Tuesday, August 23. The parties cooperated by filing excellent briefs and thoroughly arguing all issues raised in this appeal. The Court entered a stay, in order to more thoroughly examine the is-

sues presented, and called for additional briefs to be filed by August 29. Supreme Court Justice Powell refused to vacate the stay. Our decision here reflects the full consideration of the merits of the case based on the record from the trial and both habeas corpus proceedings, voluminous briefing at the trial and appellate stage, extensive oral argument, and the Court's independent research on the legal issues involved.

To understand our decision, insofar as it relates to the abuse of the writ and the waiver issues, it is helpful to review a chronology of the prior proceedings in this case:

Jan. 30, 1975    Petitioner convicted.

Feb.   1975    Rebecca Smith Machetti convicted.

| Jan. | 6, 1976 | Conviction & sentences aff'd – *Smith v. State*, 236 Ga. 12, 222 S.E.2d 308 (1976).[1] |
| July | 6, 1976 | *Cert. denied, Smith v. Georgia*, 428 U.S. 910, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976). |
| Oct. | 4, 1976 | Petition for rehearing denied, *Smith v. Georgia*, 429 U.S. 874, 96 S.Ct. 3224, 49 L.Ed.2d 1219 (1976). |
| Oct. | 22, 1976 | Petition for Writ of Habeas Corpus – Georgia Superior Court. |
| Mar. | 16, 1977 | Petition dismissed (unpublished order). |
| Oct. | 18, 1977 | Order dismissing petition affirmed, *Smith v. Hopper*, 240 Ga. 93, 239 S.E. 2d 510 (1977).[2] |
| June | 5, 1978 | *Cert. denied, Smith v. Hopper*, 436 U.S. 950, 98 S.Ct. 2859, 56 L.Ed.2d 793 (1978). |
| Oct. | 2, 1978 | Petition for rehearing denied, *Smith v. Hopper*, 439 U.S. 884, 99 S.Ct. 229, 58 L.Ed.2d 199 (1978). |

1. Although convicted at separate trials, the cases of both petitioner and his wife were consolidated on direct appeal, since, with minor exceptions, the enumerated errors were common to both cases. They were represented by separate attorneys.

The enumerations of error were: (1) the testimony of the accomplice, John Maree, was not corroborated in that there was no independent evidence which connected the defendants with the alleged crimes or the commission thereof, (2) the trial court erred in admitting numerous instances of hearsay testimony where no evidence of a conspiracy existed independent of the testimony of the alleged coconspirator and accomplice, John Maree, (3) the trial court erred in admitting testimony of John Maree as to hearsay statements allegedly made by Rebecca Machetti in violation of defendant's rights to the confrontation clause, and as to petitioner where it was not shown that Rebecca Machetti would refuse to testify or was otherwise unavailable to testify to the truth of such statements, (4) the trial court erred in admitting the testimony of two officers concerning their interviews with defendants without informing them of their *Miranda* rights, (5) because there was no valid statute authorizing the death penalty for murder in Georgia, the trial court committed reversible error in imposing the death penalty, (6) reversible error was committed by the trial court in overruling the demurrer to the indictment, (7) the evidence was insufficient to support a finding by the jury of the statutory aggravating circumstance necessary in death penalty cases, (8) the trial court erred in excluding prospective jurors because of their conscientious reservations against imposing the penalty in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), (9) the Georgia death penalty statute does not conform to the requirements of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and the death penalty violates the eighth amendment, (10) the death penalty was disproportionate to the sentence imposed in similar cases, and (11) it was reversible error to permit cross-examination of petitioner about a letter from him to his wife and to admit a portion of the letter into evidence for the limited purpose of impeaching his testimony.

The Georgia Supreme Court undertook a sentence review for excessiveness, proportionality, and the influence of passion, prejudice, or any other arbitrary factor, and whether the evidence supported the jury's findings of aggravating circumstances.

2. The Supreme Court of Georgia dealt with three issues on appeal from denial of habeas corpus relief: (1) petitioner was deprived of an impartial jury representing a true cross-section of the community as required by *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), because persons who would automatically vote against imposing the death penalty without regard to the evidence were excused from the jury. *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Evidence presented to the habeas corpus court showed that a *Witherspoon* qualified jury is guilt-prone and hence more likely to convict at the guilt phase of a bifurcated trial. "Because this is a death penalty case," 239 S.E.2d at 510, the court assumed without deciding there was cause to allow the objections to the composition of the traverse jury and did not apply the waiver rule of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), (2) the trial judge erred in failing to inquire of two excused prospective jurors whether they were able to make their personal views on the death penalty subservient to their legal duty as jurors, and (3) a letter from petitioner to his wife should not have been allowed in evidence.

| Feb. 21, 1979 | Petition for Writ of Habeas Corpus filed in U.S. District Court, M.D. Ga. |
| Sept. 9, 1980 | U.S. Magistrate recommended denial of all relief. |
| Nov. 26, 1980 | District court denied relief (unreported order and judgment). |
| Nov. 2, 1981 | This Court affirmed, *Smith v. Balkcom,* 660 F.2d 573 (5th Cir. Unit B 1981).[3] |
| Mar. 29, 1982 | Opinion modified on rehearing, 671 F.2d 858 (5th Cir. Unit B 1982). |
| Oct. 5, 1982 | *Cert. denied, Smith v. Balkcom,* — U.S. —, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). |
| June 25, 1982 | Second Petition for Writ of Habeas Corpus filed in Georgia Superior Court. |
| | Georgia Superior Court dismissed immediately without consideration of the merits. |
| Sept. 16, 1982 | Georgia Supreme Court remanded appeal "for an evidentiary hearing on the issues raised in the Petition." |
| Nov. 15, 1982 | Superior Court on remand (after brief hearing on waiver issues) denied evidentiary hearing on merits and dismissed. |
| Mar. 1, 1983 | Georgia Supreme Court reversed and remanded case again for evidentiary hearing on prosecutorial claim of misconduct. *Smith v. Zant,* 250 Ga. 645, 301 S.E.2d 32 (1983). |
| May 10, 1983 June 10, 1983 | Evidentiary hearings before Superior Court. |
| Aug. 5, 1983 | Superior Court's order denying relief. |
| Aug. 16, 1983 | Georgia Supreme Court denied application for CPC. |
| Aug. 17, 1983 | Petition for Writ of Habeas Corpus filed in U.S. District Court, M.D. Ga. |
| Aug. 17, 1983 | Oral Argument before District Court. |
| Aug. 18, 1983 | Petitioner's motion for an evidentiary hearing. |
| Aug. 19, 1983 | Order denying motion. Order dismissing petition, denying CPC, denying IFP and denying stay of execution pending appeal. |
| Aug. 19, 1983 | Notice of Appeal (11th Cir.). |
| Aug. 22, 1983 | Application for CPC, IFP and certificate of good faith and application for stay of execution. |
| Aug. 23, 1983 | Oral Argument and Order granting CPC, IFP, and stay of execution. |
| Aug. 24, 1983 | Motion to Vacate Stay filed with Justice Powell. |
| Aug. 24, 1983 | Justice Powell's Order declining to vacate stay. |
| Aug. 25, 1983 | This Court's letter to counsel to file other material by August 29. |

In these appeals and petitions, a total of 28 jurists on seven separate state and federal courts, some on several occasions (the Supreme Court of the United States has been petitioned four times, the Georgia Supreme Court five), have considered Smith's claims. He has sought procedural devices (stays of execution and full hearings) to insure that his claims be fully developed and considered as well as relief on their merits. He has been provided most of the procedural protections sought. No court has found merit in any of his claims.

## I. Alleged *Giglio* Violation.

The petitioner did not raise the claimed *Giglio* violation until his second state habeas corpus petition. At the insistence of the Supreme Court of Georgia on its second remand of that petition to the state habeas corpus judge, a hearing was held on petitioner's claim that the prosecution failed to correct the false testimony of John Maree, an accomplice and eyewitness who testified against Smith at the latter's trial, that Maree had no plea agreement with the state. *Smith v. Zant,* 250 Ga. 645, 301 S.E.2d 32 (1983). Prosecutorial suppression of an agreement with or promise to a material witness in exchange for that witness' testimony violates a criminal defendant's due process rights. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The state must affirmatively correct testimony of a witness who fraudulently testifies that he has not received a promise of leniency in exchange for his testimony.

**3.** Smith raised three main issues on appeal from denial of federal habeas corpus relief. The exclusion from the jury for cause of two veniremen who were unequivocally opposed to the death penalty violated his sixth and fourteenth amendment rights in three respects: (1) the jury was conviction-prone, and not impartial; the jury did not represent a fair cross-section of the community; and the cumulative effect of such death qualification of jurors infringes the sixth amendment right to a properly functioning jury, (2) petitioner's death sentence was imposed pursuant to an arbitrary and racially discriminatory pattern of capital sentencing in Georgia, and (3) Georgia's capital sentencing review procedures are constitutionally inadequate.

Maree testified on cross examination that he had never received any promises in exchange for his testimony other than "protection for my family and myself." Smith alleges that Maree had received a promise of a life sentence in exchange for testimony against petitioner and that the prosecutor concealed this promise from the jury.

On remand, the issue before the state habeas court centered upon the existence, *vel non,* of such a promise to, or agreement with, witness Maree. After what we find to have been a full and fair hearing, the state judge found, as a fact, that there had been no such promise or agreement.

The hearing was extensive. While the issue was first joined upon exhibits of sworn statements of Fred Hasty, the District Attorney who had prosecuted petitioner and a contradictory affidavit of witness Maree, it was not confined to that. Hasty was called and testified, in person, before the court. Indeed, every person in life who was suggested as having knowledge of the alleged deal appeared, in person, and gave testimony on direct and cross examination.

Hasty denied that he had extended any promise to, or made any agreement with, witness Maree. He acknowledged that he had given prior contradictory sworn statements. In explaining the contradiction between his live testimony at the state habeas hearing and both the sworn statement in a deposition he gave in Becky Machetti's case and an affidavit he gave to Millard Farmer on behalf of appellant's counsel, Hasty testified that he thought the latter statements were true when he gave those statements, but after reviewing his file and the transcript of appellant's trial, Hasty realized that these statements were not true. Transcript of May 10, 1983 hearing at 88–89, 93. Hasty explained that when he gave those statements, he had not reviewed his file or the transcript. Transcript of May 10, 1983 hearing at 100–101. Hasty testified that at the time of Smith's trial, he knew what he was going to do with reference to the case pending against John Maree, if Maree testified, but did not discuss this with Mr. Sparks. Transcript of May 10, 1983 hearing at 77.

The sworn testimony of every live witness who testified at the state habeas hearing contradicts Hasty's two affidavits. Willis Sparks, who represented Maree on the murder charge in 1974, testified that he had asked then District Attorney Hasty "point-blank" what Maree would receive from the prosecution in return for his testimony. Sparks swore that Hasty had steadfastly replied that the prosecutor would make no agreement with a co-defendant before trial because that was not his practice. Sparks further testified that Assistant District Attorney Thompson had never made any promise to Maree and that no one from either the Bibb County district attorney's office or sheriff's department had ever made any promises to Sparks as Maree's attorney. Sparks testified that he had recommended to Maree that the latter testify because Maree had already made a valid confession. Sparks had also noted that the confession had been corroborated by Maree's palm print found in the victim's car and that the state could and might well seek the death penalty against Maree.[4]

Bibb County Sheriff Ray Wilkes stated that he was Chief Deputy of Bibb County when petitioner was tried and that no member of the sheriff's office made any promises to Maree.

Although the state habeas judge had before him the affidavit of Maree, then serving a life sentence, petitioner urged that Maree should appear and testify under cross examination. The state offered to produce Maree and the hearing was adjourned to a date for his appearance. On June 13, 1983, one month after the initial hearing, he was

---

4. Sparks recalled that, after petitioner's trial, but before Becky Machetti's trial, Maree had "balked" and expressed unwillingness to testify further, protesting that, as Sparks well knew, Maree had no "deal" with the prosecutor. Sparks had reported his client's reluctance to give further testimony to Hasty who persisted in his refusal to promise Maree anything. Ultimately, Maree testified in Becky Machetti's trial, on Sparks' advice, even in the absence of any promise or agreement.

produced, sworn, and testified. His testimony was unequivocal. Maree testified that "at the first trial, there was no question about testifying. I didn't have any real conversation regarding any kind of a deal whatsoever." Transcript of June 13, 1983 hearing at 10. Maree unequivocally stated that he had had no discussions with Hasty concerning a life sentence in exchange for his testimony at Smith's murder trial. *Id.* Maree also stated at the state habeas hearing that he had testified at Smith's trial on advice of his counsel Sparks who had concluded that it was in Maree's best interest, under all the circumstances, to give full truthful testimony.

█ If the state habeas court afforded petitioner a full and fair hearing, we, as a federal habeas court, must apply a presumption of correctness to the state court's written factual findings. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); 28 U.S.C. § 2254(d). Petitioner must rebut this presumption by establishing by convincing evidence that the state court's findings are erroneous. *Sumner v. Mata,* 449 U.S. at 546, 101 S.Ct. at 768–69; *Hance v. Zant,* 696 F.2d 940, 946 (11th Cir. 1983).

The state court's findings of fact are amply supported by the evidence. Although Hasty's testimony was subject to the impeachment inherent in his prior sworn statements (which as sworn affidavits, constituted evidence of the facts stated in them), the state habeas judge found that there had been no promise made to, or agreement made with, witness Maree. In so finding, the judge found in accordance with all the sworn testimony taken from all the witnesses who appeared before him. To have found to the contrary would have required a finding that each and every witness who knew the facts had lied in their testimony given at the hearing.

█ Resolution of conflicts in evidence and credibility issues rests within the province of the state habeas court, provided petitioner has been afforded the opportunity to a full and fair hearing. 28 U.S.C. § 2254(d) does not give federal habeas courts "license to redetermine credibility of witnesses whose demeanor has been observed by the state ... court, but not by them." *Marshall v. Lonberger,* —— U.S. ——, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). The state court's finding that there was no agreement between Maree and the prosecution is "fairly supported by the record." See 28 U.S.C. § 2254(d)(8). Petitioner has not satisfied his burden of proving by convincing evidence that this finding was erroneous.

Petitioner asserts that the state habeas hearing was not full and fair. He first asserts that the hearing was flawed because, at that hearing, Hasty was represented by private counsel and representatives of the State Bar of Georgia were present. Petitioner's assertions that Hasty had made a "deal" with witness Maree and had abided its concealment at petitioner's trial had attracted the bar's attention. Such conduct might well constitute unethical conduct. Petitioner does not contend that the presence of the bar investigators or Hasty's counsel prevented petitioner from presenting any evidence or argument or otherwise fully developing his claim.

As we view the record, the impact, if any, of the pendency of state bar proceedings against Hasty aided petitioner. The state habeas court was certainly aware of the presence of the bar investigators. The fact that Hasty was subject to such proceedings would tend to impeach his testimony at the hearing, to petitioner's benefit. The presence of his private counsel, retained in connection with the disciplinary matter, and the presence of the bar representatives presented motivation to Hasty to exonerate himself most dramatically. It would have been material to petitioner's attack upon Hasty's testimony to have proven the coincident disciplinary proceedings. They were shown to the state court more effectively than petitioner could have been expected to prove.

Attorney Millard Farmer, said to have been doing "leg work" for petitioner's attorneys, had taken the affidavit from Hasty offered in support of petitioner's claim.

After concluding the second hearing, at which Hasty had denied the correctness of the affidavit and had sworn that he had been assured by Farmer that he would have an opportunity to correct it, the state judge allowed petitioner additional time to produce Farmer as a witness, live or by deposition. Transcript of June 13, 1983 hearing at 144-45. Petitioner chose, instead, to file Farmer's affidavit.

Petitioner argues that the state habeas hearing was faulty in that he was not allowed to subpoena and inspect the confidential record of the Georgia State Pardon and Parole Board concerning witness Maree. Georgia law provides that these files remain confidential. O.C.G.A. § 42–9–53. It is suggested that such a record might contain some support for the contention that, before petitioner's trial, a promise had been made to Maree. At the district court's direction this file, sealed, was provided to the district judge who examined it in camera. It is a part of the record before us. We have examined it. It offers no support for that proposition.

Petitioner asserts that the state hearing was less than full and fair in that the state court refused to admit testimony from proffered witness Reverend Murphy Davis. This witness offered to state that long after petitioner's trial, Davis had participated in a debate with former Assistant Bibb County District Attorney Donald Thompson as to the propriety, *vel non,* of the death penalty and that at that debate, Thompson had stated that it was necessary for Maree to be let off with a life sentence in order to obtain evidence against petitioner and Rebecca Machetti. Petitioner offered Davis' testimony to prove the truth of Thompson's statement. Thompson pre-deceased these proceedings. Aside from the insufficiency of what Thompson is alleged to have said to prove the existence of a pretrial deal with witness Maree, this evidence was offered to prove the truth of the matter therein and constituted inadmissible hearsay. The state judge permitted petitioner to proffer the testimony of Rev. Davis in the form of a direct examination of Davis.

We conclude that the state habeas court afforded petitioner a full and fair hearing on this contention. All witnesses desired by petitioner were produced even where adjournment was required for their production. No admissible evidence offered by petitioner was excluded. The finding that there was not a pretrial agreement or promise to Maree was supported by all the sworn testimony and it was substantial. Absent a deal or promise, there was no *Giglio* violation arising from the failure of the prosecution to reveal one.

Petitioner alternatively asserts that the prosecution presented a threat against witness Maree and that failure to reveal this threat to the jury violated *Giglio v. United States, supra.* In pretrial discussions with Maree and his counsel, Sparks, the prosecutor had outlined Maree's position. Maree had confessed to the murders. His confession gave the prosecutor a better case against Maree than the state possessed against Maree's co-indictees. The nature of the crime made the death penalty available.

Nothing stated to Maree was concealed from the jury. Maree's testimony at trial made it abundantly clear that he was subject to prosecution. The jury knew that. No one concealed from the jury that Maree hoped, by testifying, that he might escape the death penalty. If that was not apparent from Maree's testimony, the prosecutor made it clear to the jury when he said, in closing argument

I want to tell you one other thing. . . . This indictment charges John Eldon Smith, a/k/a Machetti, Rebecca Smith a/k/a Machetti, and John Maree, Jr. with the offense of Murder in two counts, and this case has been severed and Tony Machetti is being tried. You are not to pass on the guilt of the other two defendants. As District Attorney of this Circuit, I tell you that those two other defendants will be tried and I tell you if I have anything to do with it those two defendants will be convicted of Murder and you will hear, I am sure, the defense attorney has the closing argument and will talk to you about John Maree, what he is going to

get out of this trial. I can tell you right now what he is going to get out of it. He is going to be convicted of Murder, two counts of Murder, if I have anything to do with it. You heard his testimony that he was promised protection for his family. Of course, you have to understand in his testimony that he is hoping he is going to save himself from the electric chair. It is the human reaction. It is natural for him to hope that but he told you, and I can tell you, there has been no promise.

The threatened position of Maree was clear to the jury. He was subject to prosecution on two counts of murder (He was so prosecuted); the district attorney intended to obtain convictions on both counts (He did); Maree was hoping to avoid the death penalty (He did); but no promise had been made to him.

The thrust of *Giglio* and its progeny has been to ensure that the jury know the facts that might motivate a witness in giving testimony, and that the prosecutor not fraudulently conceal such facts from the jury. We must focus on "the impact on the jury." *United States v. Anderson,* 574 F.2d 1347, 1356 (5th Cir.1978); *see United States v. Meinster,* 619 F.2d 1041, 1044–45 (4th Cir.1980) (Intent of *Giglio* "is not to punish the prosecutor; rather the primary concern is that the jury not be misled by the prosecution's knowing use of perjured testimony."); *United States v. Barham,* 595 F.2d 231, 243 (5th Cir.1979).

In this case Maree's fears and aspirations were clear. The jury was made aware of Maree's situation and could test his credibility taking his threatened posture into consideration. Under the facts of this case, no *Giglio* violation occurred.

## II. Appellant's Contention that Georgia Death Penalty Statute Is Arbitrarily And Discriminatorily Imposed.

In this successive habeas corpus petition, petitioner asserts that the death penalty in Georgia is arbitrarily and discriminatorily imposed. Smith unsuccessfully raised this same claim in his first federal habeas corpus petition. *Smith v. Balkcom,* 660 F.2d 573 (5th Cir. Unit B 1981), *modified,* 671 F.2d 858 (5th Cir. Unit B), *cert. denied,* —— U.S. ——, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). Appellant admits that the issue raised in this petition is the same claim which was previously decided adversely to him but asserts that he now has additional evidence which he could not have presented the first time this court adjudicated this issue. Alternatively, petitioner contends that this court altered the standard by which we adjudicate claims of discriminatory application of the death penalty in Georgia.

Rule 9(b) of the Rules governing § 2254 cases provides:

A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert these grounds in a prior petition constituted an abuse of the writit.

Appellant correctly notes that a denial of an application for habeas corpus is not *res judicata* with respect to subsequent applications. *Sanders v. United States,* 373 U.S. 1, 7, 83 S.Ct. 1068, 1072–73, 10 L.Ed.2d 148 (1963). Rule 9(b) codifies the seminal case of *Sanders* and preserves existing case law with respect to abuse of the writit. Advisory Committee Note, Rule 9, Rules Governing Section 2254 cases in the United States District Courts (28 U.S.C.A. Foll. § 2254); *Potts v. Zant,* 638 F.2d 727, 739 (5th Cir. Unit B), *cert. denied,* 454 U.S. 877, 102 S.Ct. 357, 70 L.Ed.2d 187 (1981).

In order to curb the opportunity for prisoners to file nuisance or vexatious petitions, and to ease the burden on the courts arising from such petitions, guidelines have evolved as to when a district court, in the exercise of its sound judicial discretion, may decline to entertain on the merits a successive or repetitious petition. These guidelines reflect a concern that in the absence of abuse, a federal

habeas court will adjudicate at least once the claims of a petitioner.

*Potts v. Zant,* 638 F.2d at 738.

■ In *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), the Supreme Court held that a federal court may give

controlling weight ... to denial of a prior application for federal habeas ... relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant to the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

*Id.* at 15, 83 S.Ct. at 1077. In determining whether the "ends of justice" would be served by readdressing the merits of the same contention as raised in the prior petition, we must look at objective factors, such as whether this was a full and fair hearing with respect to the first petition and whether there has been an intervening change in the law. *Id.* at 16–17, 83 S.Ct. at 1077–1078; *Potts v. Zant,* 638 F.2d at 739.

In the case at bar, Smith concedes that his argument regarding the alleged discriminatory application of Georgia's death penalty statute presents the same claim that was determined adversely to the applicant in the prior adjudication. No party disputes that the prior determination was on the merits. *See Smith v. Balkcom,* 660 F.2d 573 (5th Cir. Unit B 1981), *modified,* 671 F.2d 858 (5th Cir. Unit B), *cert. denied,* —— U.S. ——, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). We must therefore determine whether a new adjudication of the merits of petitioner's argument would serve the ends of justice. We conclude that it would not.

■ Petitioner bears the burden of showing that the ends of justice would be served by a redetermination. *Sanders v. United States,* 373 U.S. at 17, 83 S.Ct. at 1078. Appellant has not alleged that the initial hearing on this issue was not full and fair. *See id.* at 16–17, 83 S.Ct. at 1077–1078. Smith cannot assert that the denial of the earlier petition constituted plain error. *See*

*Bailey v. Oliver,* 695 F.2d 1323, 1325–26 (11th Cir.1983). Petitioner asserts, however, that the panel's modification of its original opinion constituted a change in the law justifying his failure to raise a crucial point by presenting evidence of discriminatory impact. *See Sanders v. United States,* 373 U.S. at 16–17, 83 S.Ct. at 1077–1078. This assertion lacks merit.

■ The modification of our opinion in the earlier adjudication of petitioner's contention, *Smith v. Balkcom,* 671 F.2d at 859, did not alter the requirement that a petitioner prove intentional discrimination. Our earlier opinion, 660 F.2d 573, 585 (5th Cir. Unit B 1981), implied that the court would never find intentional or purposeful discrimination from circumstantial proof or proof of racially disproportionate impact. The modified opinion acknowledged that under long existing precedent, in certain instances, "statistical evidence of racially disproportionate impact may be so strong that the results permit no other inference but that they are the product of a racially discriminatory intent or purpose." *Smith v. Balkcom,* 671 F.2d at 859 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977) and *Furman v. Georgia,* 408 U.S. 238, 389 n. 12, 92 S.Ct. 2726, 2804 n. 12, 33 L.Ed.2d 346 (1972) (Burger, C.J., dissenting)). That is the proposition upon which Smith proceeded in his first habeas petition and our opinion worked no change in that proposition. Neither the original panel opinion nor the modification undertook to declare what evidence would prove purposeful discrimination by a state; they merely pointed up some shortcomings in the evidence petitioner offered to support his claim. There was no remand. The issue having been fully and fairly presented by petitioner in this first habeas petition was finally decided.

Petitioner's attempt to present "new evidence" in his second petition merely seeks to introduce a modified and expanded version of statistics already rejected by this court in adjudicating the merits of the prior

petition. In this successive habeas petition, Smith offers additional conclusions said to be drawn from the same records that were available to him when this identical assertion was made and adjudicated by the several courts which passed upon it. To entertain such piecemeal submissions would not serve the ends of justice but would allow prisoners to file nuisance and vexatious petitions. To allow Smith to reassert this claim would allow any unsuccessful habeas petitioner to file additional successive applications by keeping teams of aides at work studying the same data and proffering additional arguments and conclusions derived from and based upon the ongoing study. That is precisely what Rule 9(b) prohibits. Without a further showing of how the ends of justice would be served by considering Smith's reassertion of the same discrimination claim, Rule 9(b) precludes consideration of the merits of petitioner's argument in this successive petition.

### III. Constitutionality of Jury.

Smith made no challenge to the jury because of the underrepresentation of women at or before trial. The Georgia procedural rule requires that a defendant's challenge to jury composition be made at or before the time the jury is "put upon him". O.C.G.A. § 15–12–162; Ga.Code Ann. § 59–803. Smith also failed to raise the jury composition issue on direct appeal to the Georgia Supreme Court, in his initial state habeas corpus action, or in his initial federal habeas corpus petition. Smith's wife, however, while not raising the issue at trial did in her first habeas corpus proceeding challenge the underrepresentation of women on the jury under *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Although she failed to obtain state relief, she did succeed in her first federal habeas corpus appeal. *Machetti v. Linahan,* 679 F.2d 236 (11th Cir.1983). This Court held the Georgia "opt-out" provision for women led to unconstitutional underrepresentation of women under *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). Petitioner and his wife were tried within a few weeks of each other in the same county so that the Georgia provision applied to both juries.

The questions before this Court are (1) whether Smith's failure to comply with this state procedural rule constitutes a waiver of his right to challenge the jury composition, and (2) if there was such a waiver, whether Smith is entitled under any theory to be relieved of its preclusive effect.

We hold that Smith has not established "cause and prejudice" for his failure to raise the allegation of illegal jury composition until his second, successive state habeas corpus petition. We affirm the district court's holding that it was prohibited from considering this claim on its merits.

■■■■ The law is clear that even if a jury is unconstitutional, that alone will not invalidate a conviction and death sentence if the defendant failed to make the proper constitutional challenge. *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); *Huffman v. Wainwright,* 651 F.2d 347, 349 (5th Cir. Unit B 1981); *Evans v. Maggio,* 557 F.2d 430, 432–33 (5th Cir.1977); *Marlin v. Florida,* 489 F.2d 702 (5th Cir.1974). A failure to comply with state procedural requirements can be a waiver of the right to assert a constitutional violation. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A state may restrict the time during which a defendant may raise a constitutional violation. *Parker v. North Carolina,* 397 U.S. 790, 798–99, 90 S.Ct. 1458, 1462–63, 25 L.Ed.2d 785 (1970). A federal court will honor a valid state procedural rule that a defendant's failure to object to a grand or petit jury before or during trial constitutes waiver of that objection as a basis for habeas corpus relief. *Francis v. Henderson,* 425 U.S. 536, 541–42, 96 S.Ct. 1708, 1711, 48 L.Ed.2d 149 (1976).

■■■■ It is clear from the record, and the parties agree, that Smith made no objection to the jury composition because of underrepresentation of women at or before his trial, and therefore waived his right to as-

sert the matter under state law.[5]  The question is therefore whether Smith is entitled under any theory to be relieved of his waiver of the claim, and to assert the jury composition claim on this second petition for habeas corpus.

The Supreme Court has held that for a federal court to consider the merits of a defendant's claim, where the defendant has failed to comply with a state contemporaneous objection rule, the defendant must show "cause" for noncompliance with the rule and "actual prejudice."  *United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 89, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977); *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976).

The requirement in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), that a defendant show "cause" for noncompliance with a state contemporaneous objection rule was designed to eliminate the possibility of "sandbagging" by defense lawyers, and to reduce the possibility that the federal court will decide a constitutional issue without the benefit of the state's views.  *Sykes,* 433 U.S. at 89–90, 97 S.Ct. at 2507–2508; *Ford v. Strickland,* 696 F.2d 804, 816 (11th Cir.1983) (en banc), *petition for cert. filed,* No. 82–6923 (June 14, 1983).  While the Supreme Court has not explicitly defined cause and prejudice, our precedents have stated that "cause" sufficient to excuse a procedural default is designed to avoid a "miscarriage of justice."  *Ford,* 696 F.2d at 817; *Huffman v. Wainwright,* 651 F.2d 347, 351 (5th Cir. Unit B 1981).

Smith contends that he established "cause" for noncompliance with the state procedural rule because his lawyers were ignorant of recently decided cases.  On January 21, 1975, six days before Smith's trial began, the Supreme Court decided *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).  *Taylor* held that the constitution requires that a jury be selected from a representative cross-section of the community and that the Louisiana statute which automatically excluded women from jury service unless they filed a written request to be subject to jury service, an "opt-in" statute that led to underrepresentation of women on the jury, was unconstitutional.  In *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), decided January 9, 1979, 43 days before Smith filed his first federal habeas corpus petition, the Court held unconstitutional an "opt-out" statute which granted automatic exemption from jury service to any woman requesting it.  On June 25, 1982, this Court held unconstitutional Georgia Code Ann. § 59–124 (1965) (repealed 1975), the "opt-out" statute under which Smith's jury was selected in *Machetti v. Linahan,* 679 F.2d 236 (11th Cir.1982).

\*     \*     \*     \*     \*     \*

By the Court:
  The court approves that stipulation.
By Mr. Hasty:
  The jurors whose names have been called here in the courtroom this morning and sworn are the jurors good and true to pass between the State and you on the issue of this indictment, charging you with the offenses of Murder, touching your life or death.  If you have any challenge to this array of jurors, let it be known at this time in writing, and you shall be heard.  Any challenge?
By Mr. Byrd:
  We don't have a challenge to the array as such, Your Honor, but, of course, we are reserving our right to the individual challenge.
By the Court:
  All right sir.

---

**5.** Smith's satisfaction with the jurors called, from which his trial jury would be selected, does not merely appear from lack of objection.  It was affirmatively stated in a stipulation and in Smith's counsel's response to a direct inquiry at the commencement of the proceedings on January 27, 1975.  Immediately after formal arraignment and plea, the following transpired:
By Mr. Hasty: [for the State]
  There is a stipulation that counsel would like to make, on approval of the Court, that in this formal arraignment that we use all names of the jurors who have already been called in the courtroom, that were called and sworn, and we will swear all of those jurors and the jury for this trial will be selected from that group of jurors.  All the jurors will be put on the defendant at this time, if that is satisfactory.
By Mr. Byrd: [for the Defendant]
  That is perfectly all right.

It was not until after *Machetti* was decided that Smith sought to litigate the jury composition issue in his second state habeas corpus petition, first in the Superior Court of Butts County and then in the Georgia Supreme Court. *Smith v. Zant,* 250 Ga. 645, 301 S.E.2d 32 (1983). The state habeas corpus court applied the state procedural waiver rule and did not consider the issue of alleged illegal jury composition on the merits. The Supreme Court of Georgia found that Smith had not shown grounds for raising this issue in his second habeas petition. The federal district court held that it was precluded from considering this claim because the state court applied the state procedural rule and did not consider the merits of the claim.

To show cause for his failure to object before the second state habeas corpus petition, Smith has presented affidavits that his trial lawyers were unaware of the *Taylor* decision at the time of his trial, and he argues that *Duren* and *Machetti* were intervening changes in the law which justify his failure to raise the issue until his second state habeas corpus petition.

Smith's argument fails for several reasons. First, counsel's lack of awareness of the *Taylor* decision at the time of trial does not establish "cause." In *Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 1574–75, 71 L.Ed.2d 783 (1981), the Supreme Court stated:

> Where the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labelling unawareness of the objection as cause for procedural default.

*See also Dumont v. Estelle,* 513 F.2d 793, 798 (5th Cir.1975) (reliance on state law at the time of trial does not, by itself, constitute cause).

Second, Smith has not established "cause" because of any supervening "change in the law" resulting from *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), or *Machetti v. Linahan,* 679 F.2d 236 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983). In *Lee v.* *Missouri,* 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979), the Supreme Court held that the 1979 *Duren* decision would be retroactively applied to any jury sworn after the 1975 *Taylor* decision, because *Duren* did not announce any new standards of constitutional law not evident from *Taylor.* 439 U.S. at 462, 99 S.Ct. at 711. In light of the Supreme Court's explicit statement that the principles of *Duren* were evident from *Taylor,* we cannot hold that *Duren* made such a fundamental change in the law that it established "cause" for a failure to raise the issue at Smith's trial in 1975. The *Machetti* decision, which declared the Georgia "opt-out" provision unconstitutional, merely applied the Supreme Court's *Duren* decision striking the Missouri "opt-out" statute.

Smith's jury composition claim thus emanates directly from *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Smith cannot contend that his first opportunity to raise this *Taylor* issue was in his *second* state petition for habeas corpus for he cited *Taylor* in 1977 during the Georgia Supreme Court's review of his *first* state petition for habeas corpus. *Smith v. Hopper,* 240 Ga. 93, 239 S.E.2d 510 (1977). Referring to the *Taylor* case, Smith claimed his jury did not represent a true cross-section of the community because jurors who would automatically vote against the death penalty were excused. That *Taylor* issue was considered by the Georgia Supreme Court, and was litigated in Smith's appeal to this Court from the denial of his first petition for federal habeas corpus relief. *Smith v. Balkcom,* 660 F.2d 573 (5th Cir. Unit B 1981), *modified,* 671 F.2d 858 (5th Cir. Unit B 1982).

Cause and prejudice are sometimes interrelated. *Huffman v. Wainwright,* 651 F.2d 347, 351 (5th Cir. Unit B 1981). In this case, Smith cannot show "cause" for his procedural default such that a hearing on the merits is necessary to prevent a "miscarriage of justice," nor can he show that "actual prejudice" from the alleged constitutional defect in jury selection affected his conviction.

In *Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975), a criminal defendant had been convicted by a jury chosen in accordance with the Louisiana procedures later held unconstitutional in *Taylor.* Before *Taylor* was decided, Daniel had raised a timely motion to quash the petit jury venire, alleging that the jury selection procedures were unconstitutional because they resulted in the systematic exclusion of women from the petit jury venire. His motion was denied by the state court and the Louisiana Supreme Court. The United States Supreme Court was thus faced with the question of whether to apply *Taylor* to a case involving a jury (1) chosen according to the procedures declared unconstitutional in *Taylor,* and (2) empaneled prior to the *Taylor* decision, where there was no procedural default by the defendant. The Court held that the *Taylor* decision was "not to be applied, as a matter of federal law, to convictions obtained by juries empaneled prior to the date of [*Taylor*]". *Daniel,* 420 U.S. at 32, 95 S.Ct. at 705. The Court stated:

> In *Taylor,* as in *Duncan,* our decision did not rest on the premises that every criminal trial, or any particular trial, was necessarily unfair because it was not conducted in accordance with what we determined to be the requirements of the Sixth Amendment. In *Taylor,* as in *Duncan,* the reliance of law enforcement officials and state legislatures on prior decisions of this Court, such as *Hoyt v. Florida,* 368 U.S. 57 [82 S.Ct. 159, 7 L.Ed.2d 118] (1961), in structuring their criminal justice systems is clear. Here, as in *Duncan,* the requirement of retrying a significant number of persons were *Taylor* to be held retroactive would do little, if anything, to vindicate the Sixth Amendment interest at stake and would have a substantial impact on the administration of criminal justice in Louisiana and in other States whose past procedures have not produced jury venires that comport with the requirement enunciated in *Taylor.*

420 U.S. at 31–32, 95 S.Ct. at 705. *See also DeStefano v. Woods,* 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (Supreme Court decisions holding states could not deny jury trial in serious criminal cases and criminal contempt cases did not apply retroactively to trials before those decisions).

Because the unconstitutional jury composition in *Daniel* did not necessarily render the defendant's criminal trial unfair, we fail to see how Smith can establish "actual prejudice" which affected his conviction, or how application of the procedural default rule to Smith's case could result in a "miscarriage of justice." This is especially true where Smith, unlike *Daniel,* involves a procedural default.

We thus hold that Smith has not shown that the federal court could consider the merits of this claim under the existing legal authorities. The stay of execution hereinbefore granted is vacated. The judgment of the district court is

AFFIRMED.

HATCHETT, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent on the *Giglio* issue. The prosecutor, Fred Hasty, in his closing argument in John Eldon Smith's 1975 trial, stated:

> I want to tell you one other thing . . . . This indictment charges John Eldon Smith, a/k/a Machetti, Rebecca Smith a/k/a Machetti, and John Maree, Jr. with the offense of Murder in two counts, and this case has been severed and Tony Machetti is being tried. You are not to pass on the guilt of the other two defendants. As District Attorney of this Circuit, I tell you that those two other defendants will be tried and I tell you if I have anything to do with it those two defendants will be convicted of Murder, and you will hear, I am sure, the defense attorney has the closing argument and will talk to you about John Maree, what he is going to get out of this trial. I can tell you right now what he is going to get out of it. He is going to be convicted of Murder, two counts of Murder, if I have anything to do with it. You heard his testimony that he was promised protection for his fami-

ly. Of course, you have to understand in his testimony that he is hoping he is going to save himself from the electric chair. *It is the human reaction. It is natural for him to hope that but he told you, and I can tell you, there has been no promise.* [Emphasis added.]

In *Giglio v. United States,* 405 U.S. 150, 153–154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), a unanimous Supreme Court stated:

As long ago as *Mooney v. Holohan,* 294 U.S. 103, 112, 79 L.Ed. 791, 794, 55 S.Ct. 340 [342], 98 ALR 406 (1935), this Court made clear that *deliberate deception of a court and jurors by the presentation of known false evidence* is incompatible with "rudimentary demands of justice." This was reaffirmed in *Pyle v. Kansas,* 317 U.S. 213, 87 L.Ed. 214, 63 S.Ct. 177 (1942). In *Napue v. Illinois,* 360 U.S. 264, 3 L.Ed.2d 1217, 79 S.Ct. 1173 (1959), we said, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.,* 269 [79 S.Ct. at 1177], 3 L.Ed.2d at 1221. Thereafter *Brady v. Maryland,* 373 U.S. [83], at 87, 10 L.Ed.2d [215] at 218, 83 S.Ct. 1194 [at 1197] (1963), held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution." *See* American Bar Association, Project on Standards for Criminal Justice, Prosecution Function and the Defense Function § 3.11(a). When the "reliability of a given witness may well be determinative of guilt or innocence," *nondisclosure of evidence affecting credibility* falls within this general rule. *Napue, supra* [360 U.S.], at 269 [79 S.Ct. at 1177], 3 L.Ed.2d at 1221. We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . ." *United States v. Keogh,* 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required under *Brady, supra* [373 U.S.], at 87 [83 S.Ct. at 1196], 10 L.Ed.2d at 218. A new trial is required if "the false testimony could . . . in any

reasonable likelihood have affected the judgment of the jury . . . ." *Napue, supra* [360 U.S.], at 271 [79 S.Ct. at 1178], 3 L.Ed.2d at 1222.

If a prosecutor fails to disclose to the jury an understanding or promise made to a witness, a *Giglio* violation occurs. Since an understanding existed between the prosecutor, Hasty, and the witness, Maree, undisclosed to the jury, I would remand to the district court for an evidentiary hearing on the issue. In order to appreciate the extent of the possible violation, it is vital to understand the facts as disclosed on the face of the record.

John Maree, a co-participant in the crime, was the key to successful prosecution of the two murders involved in this case. The state's case against Maree was strong. The state's evidence against Maree included his confession, his hand prints from the victim's automobile, and a witness placing him at the crime scene. The case against Smith was weak. Without Maree's testimony, Smith could not be placed at the crime scene.

Seven years after Smith's trial, Hasty, the prosecutor who tried the case, told Millard Farmer, a lawyer and old acquaintance, that he (Hasty) had made a deal with Maree. Hasty explained that the deal was: a recommendation for a life sentence in exchange for Maree's testimony against the Smiths. Farmer conveyed Hasty's remarks to Smith's counsel in New York. On May 25, 1983, Farmer presented an affidavit to Hasty reciting the subject matter of that prior conversation. After the two men had lunch together, Hasty found an error in the affidavit and had his secretary retype it correcting the error. At the time Hasty signed the affidavit, Farmer informed him that the affidavit would be used in Smith's post-conviction relief efforts. Hasty's affidavit in one portion stated:

3. Prior to the trial of John Smith, *I offered John Maree,* the only known eyewitness to the crime, sentences [sic] of life imprisonment in exchange for testimony against John Smith and Rebecca

Smith/Machetti. *Mr. Maree agreed* to testify against both John Smith and Rebecca Machetti in exchange for sentences [sic] of life imprisonment. I further told John Maree that I would seek the death penalty against him if he did not testify in the trials of John Smith and Rebecca Smith/Machetti. After the trials, John Maree was in fact permitted to plead guilty and did receive sentences of life imprisonment for his role in the Akins murders. (Emphasis supplied.)

A month after Hasty executed the affidavit, one of Smith's lawyers telephoned Hasty to inform him that the affidavit would be used in a habeas corpus petition raising a *Giglio* claim. Hasty did not object and did not claim that the affidavit was incorrect.

In the June 13, 1983, state evidentiary hearing, Hasty testified concerning the case:

I do know that at one point Mr. Boger [Smith's attorney] mentioned a *Giglio* motion that he expected to file. I do not recall any statements made about John Eldon Smith's conflict in testimony that he had given. I know that the *Giglio* motion was mentioned [but] that, at that time did not mean anything to me.

On January 12, 1983, Hasty learned for the first time that the disciplinary board of the Georgia State Bar Association had filed charges against him. Enclosed with the notice of disciplinary action were two items: 1) the transcript of Hasty's closing argument during Smith's 1975 trial in which Hasty told the jury that no promises were made to Maree in exchange for his testimony, and 2) an excerpt from a 1978 deposition in which Hasty stated that he made a pre-trial agreement with Maree to testify against Smith and his codefendant, Rebecca Machetti. The pertinent portion of the 1978 deposition stated:

A. Well, I talked to Mr. Morae [sic] of course, prior to [petitioner Smith's] trial, and he testified in that case and then he testified in Rebecca Machetti's trial ...

Q. Did he believe that he was going to get off free or get out with a light sentence by testifying?

A. We had a discussion about this, and I had agreed that if he did testify that I, I would not insist on a trial and would allow him to enter a plea of guilty and receive life sentences.

Thus, Hasty, a seasoned prosecutor, had sworn under oath on two occasions, four years apart, that he made a deal in exchange for Maree's testimony. Because he told the Smith jury no deal had been made, he was in trouble with the Georgia State Bar.

On May 10, 1983, faced with suspension or disbarment, Hasty repudiated his two prior sworn statements at Smith's state habeas corpus evidentiary hearing. Hasty stated that he promised Maree nothing in exchange for his testimony, neither a lighter sentence nor a letter to the parole board. During the same hearing, however, Hasty's testimony reveals that an understanding did exist regarding what sentence he would recommend for Maree. In response to the question of whether he had ever made any promises to Maree's attorney, Sparks, regarding Maree, Hasty testified:

I recall—I had returned early on in the investigation when I saw what evidence we had, I knew if Mr. Morray [sic] testified, I knew what my recommendation would be. I had determined that and I think I ever discussed that with Mr. Thompson. At one time I thought I had discussed it with Mr. Wilkes, but Mr. Wilkes says I did not. So, I knew what I was going to do. But, because of, again, the policy I had, I did not discuss it with Mr. Sparks. And after the Rebecca Machetti or Rebecca Smith trial was over, I recall—and this would have probably been sometime in March of 1975—I recall Mr. Sparks came to my office and wanted to talk about the case. And earlier in my mind, I had known that if he testified that I was going to make a recommendation of concurrent life sentences. I recall when Mr. Sparks came into my office that we started discussing it and at that

time I told him that I would recommend two consecutive life sentences and this upset Mr. Sparks. And he said, "Well, it ought to be concurrent." And I agreed almost immediately with him, that they would be concurrent life—recommendation for concurrent life sentences.

Hasty's explanation for his two prior sworn statements given four years apart: his "mind had become somewhat confused about what had actually happened."

Although no other clear promise is evident in the state court records, the record does show an understanding by all parties as to what would happen in the event Maree did not testify. The central portion of the understanding is illustrated by Maree's testimony. In a sworn affidavit he stated:

> The only statement made pertaining to my trial was that if I did not agree to testify, that then D.A. (Fred Hasty) would assign my case to an assistant district attorney for prosecution and that a death sentence would most likely be sought.

Maree's lawyer, Willie Sparks, characterized the understanding as follows:

> Mr. Hasty did say, as I recall, that if Morray [sic] did not cooperate, it was quite possible that he would be the first man tried, and the state might well seek the death penalty.
>
> *   *   *   *   *   *
>
> Well, after this conversation, while I can't recall precisely what was said, I conveyed to Mr. Morray [sic] that he did not have a deal with the state, but that I thought his best and wisest course purely from the point of view of his self interest was to testify for the state. His alternative was to go to trial on a case where he had already confessed a voluminous confession, where his palm print was found on the car and there was some chance the state would get the death penalty even though he did not appear to be the trigger man.

Hasty's statement of the understanding was:

Q. Willie Sparks testified that you told him that if John Morray [sic] did not give testimony that he would be tried first and you would have now testified that that's in fact what happened.

A. [Hasty] I do not remember telling Mr. Sparks that, but I know the prosecution business well enough to know that that's what I would have done.

Q. But, it is your intention that if Mr. Morray [sic] did testify to the state, you would leave open the question of whether he in fact would be tried or would be permitted to plead guilty?

A. [Hasty] Did not tell Mr. Sparks what I intended to do.

Due to the inconsistency between Hasty's testimony and his deposition and affidavit, the state court finding of no pretrial agreement is not fairly supported by the record. The incredible finding that Hasty and Maree had no understanding is supported only by Hasty's statement that he was confused. Logic, experience, and events at trial dictate otherwise.

A federal court must make its own credibility findings under these factual circumstances. State court credibility findings are never binding on a federal court. 28 U.S. C.A. § 2254(d)(8); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). The state record as a whole clearly shows that Hasty communicated to Maree the idea that he would be tried first and the death penalty sought unless he testified against Smith. This understanding, however, was not disclosed to Smith's trial jury. Instead, Hasty intentionally misled the jury as to Maree's credibility. This is a *Giglio* violation. Under *Giglio* there is "no difference between concealment of a promise of leniency and concealment of a threat to prosecute." *United States v. Sutton,* 542 F.2d 1239, 1242 (4th Cir.1976). No explicit promise or deal need be shown. The due process violation occurs if there is an undisclosed inducement for the witness's testimony. *Hawkins v. United States,* 324 F.2d 873 (5th Cir.1963). As the Ninth Circuit so aptly stated:

[W]e know from experience that the Government, . . . [has] ways of indicating to defendant's counsel that benefits are likely to result from cooperation. That can be indicated without making a bald promise that the charge is going to be reduced or that the case is going to be dismissed.

*United States v. Butler,* 567 F.2d 885, 888, n. 4 (9th Cir.1978).

The majority and the trial judge dismiss this issue with the comment that any juror would know that Maree sought to save his life by testifying. They miss the point. The point is that the jury did not know that an understanding had been reached and the witness was testifying with the assurance that his life had been saved. *Giglio* merely holds that the understanding must be disclosed. An affirmative duty is on the prosecutor to disclose the understanding rather than have the jurors attempt to figure it out. The jurors must know the facts so they may judge the testimony given in light of the interest the witness is or is not seeking to protect. As Justice Frankfurter said in *Griffin v. United States,* 336 U.S. 704, 709, 69 S.Ct. 814, 816, 93 L.Ed. 993 (1949): "it would . . . be too dogmatic, on the basis of mere speculation, for any court to conclude that the jury would not have attached significance to the evidence favorable to the defendant had the evidence been before it."

Because the state findings are unsupported by the record as a whole, I would remand this case to the district court for an evidentiary hearing.

This case again illustrates the difficulty, if not the impossibility, of imposing the death penalty in a fair and impartial manner. It is a classic example of how arbitrarily this penalty is imposed. Maree, who bargained to receive $1,000 for the murder and on whom the evidence was the strongest, is eligible for parole in November 1983. He will live because the evidence against him was overwhelming and the prosecutor needed his testimony to convict Smith and Machetti. Thus, a deal was struck.

Machetti, the mastermind in this murder, has had her conviction overturned, has had a new trial, and has received a life sentence. This court overturned her first conviction because in the county where her trial was held, women were unconstitutionally underrepresented in the jury pool. *Machetti v. Linahan,* 679 F.2d 236 (11th Cir.1982). Her lawyers timely raised this constitutional objection. They won; she lives.

John Eldon Smith was tried in the same county, by a jury drawn from the same unconstitutionally composed jury pool, but because his lawyers did not timely raise the unconstitutionality of the jury pool, he faces death by electrocution. His lawyers waived the jury issue. Judicial economy, as required by recent decisions of the United States Supreme Court, dictate that we not reach the underrepresentation of women issue, even under principles of "manifest injustice." The fairness promised in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), has long been forgotten.