## 39172. SMITH v. ZANT.

HILL, Chief Justice.

John Eldon Smith appeals from the dismissal of his successive state habeas petition in which he alleged three constitutional issues. He contends he is entitled to a hearing on the merits of these issues under OCGA § 9-14-51 (Code Ann. § 50-127), and that the habeas court erred in holding that he had waived his right to raise them and in dismissing his petition.

John Eldon Smith, also known as Anthony Isalldo Machetti, was convicted of the shotgun slayings of his wife's former husband and second wife, and was sentenced to death.[1] His conviction was affirmed in *Smith v. State,* 236 Ga. 12 (222 SE2d 308) (1976), cert. denied, 428 U. S. 910 (96 SC 3224, 49 LE2d 1219) (1976), and the denial of his first state habeas was also affirmed in *Smith v. Hopper,* 240 Ga. 93 (239 SE2d 510) (1977), cert. denied, 436 U. S. 950 (98 SC 2859, 56 LE2d 793) (1978). Smith's federal habeas petition was denied in an unpublished order from the Middle District of Georgia and affirmed on appeal in Smith v. Balkcom, 660 F2d 573 (5th Cir.

---

[1] Mrs. Machetti also received the death sentence at a separate trial, which was also affirmed at 236 Ga. 12 (222 SE2d 308) (1976), cert. denied, 429 U. S. 932 (97 SC 339, 50 LE2d 302) (1976). The denial of her petition for declaratory judgment was affirmed at 238 Ga. 655 (235 SE2d 375), cert. denied, 434 U. S. 878 (98 SC 232, 54 LE2d 159) (1977), and her application to appeal the denial of her first state habeas petition was also denied. Her first federal habeas was denied in Machetti v. Linahan, 517 FSupp. 1076 (M.D. Ga. 1981), but was reversed on appeal, Machetti v. Linahan, 679 F2d 236 (11th Cir. 1982), cert. denied, —— U. S. —— (—— SC ——, 74 LE2d 978) (1983).

1981), modified on rehearing, 671 F2d 858 (5th Cir. 1982).

Thereafter, Smith filed this, his second state habeas petition, raising constitutional issues: (1) that women were underrepresented on both his grand and petit jury panels; (2) that Georgia's death penalty statute is being applied arbitrarily and in a racially discriminatory pattern; and (3) that the failure of the prosecution to correct the testimony of John Maree, an accomplice and eyewitness who testified against Smith at his trial that he had no plea agreement with the state when that statement was not true, denied him due process and a fair trial. The habeas court dismissed his petition without a hearing as successive.

We granted Smith's application to appeal, which urged us to require the habeas court to grant him a hearing on the constitutional issues, and we immediately ordered "an evidentiary hearing on the issues raised in the petition," while retaining jurisdiction of the case. The habeas court held an evidentiary hearing, but limited its scope to whether the three constitutional issues had been waived by failing to raise them in his first habeas petition. After finding that all three issues were or should have been raised earlier, the habeas court again dismissed the petition as successive under OCGA § 9-14-51 (Code Ann. § 50-127). The transcript of that hearing was sent up, new enumerations of error were filed, and oral argument was heard on an expedited basis because we had retained jurisdiction of the original appeal. See OCGA § 9-14-52 (Code Ann. § 50-127).

1. Relying on OCGA § 9-14-51 (Code Ann. § 50-127), discussed in greater detail below, Smith seeks to raise the underrepresentation of women on his jury panels as a ground "which could not reasonably have been raised" in his original habeas petition. He argues that Taylor v. Louisiana, 419 U. S. 522 (95 SC 692, 42 LE2d 690) (1975), holding that the constitution required that women be represented adequately in jury pools, was decided only a few days before his trial.

Petitioner did not raise any challenge to his grand or traverse juries prior to his trial as required by law. *Harris v. Hopper,* 243 Ga. 244 (2) (253 SE2d 707) (1979), and cases cited; Francis v. Henderson, 425 U. S. 536 (96 SC 1708, 48 LE2d 149) (1976). He did not raise any challenge to his grand or traverse juries in his first habeas petition. OCGA § 9-14-42 (b) (Code Ann. § 50-127), applicable to the first habeas petition, provides in pertinent part: "The right to object to the composition of the grand or trial jury will be deemed waived under this Code section unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence has

otherwise become final." Petitioner did not seek to amend his first habeas corpus petition to add jury challenges while it pended for over a month nor while it was under consideration for over three additional months.

In both his first state habeas and in his federal habeas petition a related issue based on Taylor v. Louisiana, supra, was unsuccessfully raised. *Smith v. Hopper,* supra, 240 Ga. at 94; Smith v. Balkcom, supra, 660 F2d at 582. In neither his first nor second habeas petitions has he raised any question as to the competency of his trial counsel or his first habeas counsel.

Petitioner has not shown grounds for raising this issue in his second habeas petition and the habeas court did not err in refusing to hear the matter on its merits.

2. OCGA § 9-14-51 (Code Ann. § 50-127) provides: "All grounds for relief claimed by a petitioner for a writ of habeas corpus shall be raised by a petitioner in his original or amended petition. *Any grounds not so raised are waived [1] unless the Constitution of the United States or of this state otherwise requires [2] or unless any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition."* (Emphasis and brackets supplied.)

Thus, in considering a successive petition, the habeas court must determine, as the threshold matter, whether the petitioner is entitled to a hearing on the merits of his belated claims. See *Smith v. Garner,* 236 Ga. 81, 85 (222 SE2d 351) (1976). In order to be so entitled, the petitioner must raise grounds which are either constitutionally nonwaivable or which could not reasonably have been raised in the earlier petition. *Fuller v. Ricketts,* 234 Ga. 104 (214 SE2d 541) (1975); *Dix v. Zant,* 249 Ga. 810, 811 (294 SE2d 527) (1982). For example, in *Smith v. Garner,* supra, where the successive petitioner's first habeas attorney would not raise several constitutional issues despite the petitioner's requests to do so, the petitioner was allowed to proceed on the merits of his second petition. But, in *Samuels v. Hopper,* 234 Ga. 246 (215 SE2d 250) (1975), where ineffective assistance of trial counsel had been raised in petitioner's first habeas, his claim in the successive petition that the failure of his appointed trial counsel to inform him of his right to appeal was dismissed. Accord, *Yates v. Brown,* 235 Ga. 391 (3) (219 SE2d 729) (1975); *Fuller v. Ricketts,* supra.

Smith's claim that the Georgia death penalty statute is being applied arbitrarily and discriminatorily fails to meet either test of OCGA § 9-14-51 (Code Ann. § 50-127). Smith raised the unconstitutional application of the death penalty statute in his first

state habeas as well as in his federal habeas petition.[2] On rehearing, in Smith v. Balkcom, supra, 671 F2d 858-59 (5th Cir. 1982), the court had this to say on the issue: "In some instances, circumstantial or statistical evidence of racially disproportionate impact may be so strong that the results permit no other inference but that they are the product of a racially discriminatory intent or purpose. [Cits.] Smith's evidence, however, does not present such a case. The raw data selected for the statistical study bear no more than a highly attenuated relationship to capital cases actually presented for trial in the state. The leap from that data to the conclusion of discriminatory intent or purpose leaves untouched countless racially neutral variables. [fn.] The statistics are not inconsistent with the proper application of the structured capital punishment law of the state found constitutional in *Gregg v. Georgia,* 428 U. S. 153 (96 SC 2909, 49 LE2d 859) (1976). Here, the proffered evidence would not have been of sufficient probative value to have required response and no hearing was required." Now, in his successive state habeas, Smith seeks to bolster his claim of discriminatory application with preliminary analysis of a more recent study. Since, however, the ground has previously been raised and rejected, it is not cognizable in a successive petition under the requirements of OCGA § 9-14-51 (Code Ann. § 50-127), and was properly dismissed. If the rule were otherwise, a "new study" could be produced quarterly by another investigator using more detailed data to form the basis of yet another habeas petition.

3. Smith also alleges prosecutorial misconduct as another basis for granting him habeas relief. Smith's accomplice, John Maree, testified against him at trial, stating that he was an eyewitness to the murders and that Smith was the triggerman. "According to the testimony of accomplice John Maree, he was to be paid $1,000 for his participation. He testified that he and the appellant Tony Machetti drove to Macon, Georgia, where they contacted Ronald Akins and lured him into the area of the crime, ostensibly to install a television antenna, and that when he and his wife arrived at the appointed time the appellant Tony Machetti killed both of them with a shotgun. . . ." *Smith v. State,* supra, 236 Ga. at 12.

At trial, on cross-examination, the following series of questions and answers transpired between the witness Maree and Smith's defense attorney:

---

[2] Pursuant to the federal requirement of exhaustion of state remedies, the federal courts would not have entertained this claim if it had not been raised in the state courts.

Q: "How many times have you talked to Mr. Ray Wilkes [chief deputy sheriff] about this case?"

A: "Five or six times."

Q: "How many times have you talked to Mr. Fred Hasty [the district attorney] about it?"

A: "Possibly twice, I think twice, yes, sir."

Q: "How many times have you talked to Mr. Don Thompson who is connected with Mr. Hasty?"

A: "Once alone and with Mr. Wilkes being there and once with Mr. Hasty."

Q: "At the time that you talked with Mr. Wilkes in exchange for your statement, were you promised anything?"

A: "The only thing that was promised to me was protection for my family and myself. There were threats involved in this thing."

Q: "How about in respect to your liberties your freedom?"

A: "Nothing has ever been said of that."

Q: "Have you ever indicated to anyone that you expected to be out shortly?"

A: "No, sir."

Q: "Have you ever made the statement to anyone that you expected to be outside soon, on the outside?"

A: "No I haven't."

Q: "[Did you ever write in a letter which the witness was looking at to refresh his memory:] 'I expect to have plenty of fresh air on the outside soon?' "

A: "No, sir."

Thus at trial it appeared that Maree had no agreement with the state in exchange for his testimony except protection for his family and himself because of "threats." Neither the district attorney nor any other representative of the state attempted to correct or alter this impression. In fact, in closing argument, the district attorney stated to the jury: "I want to tell you one other thing. . . . The indictment charges John Eldon Smith, a/k/a Machetti, Rebecca Smith a/k/a Machetti, and John Maree, Jr., with the offense of Murder in two counts, and this case has been severed and Tony Machetti is being tried. You are not to pass on the guilt of the other two defendants. As District Attorney of this Circuit, I tell you that those other two defendants will be convicted of Murder, and you will hear, I am sure, the defense attorney has the closing argument and will talk to you about John Maree, what he is going to get out of this trial. I can tell you right now what he is going to get out of it. He is going to be convicted of Murder, two counts of Murder, if I have anything to do with it. You heard his testimony that he was promised protection for his family. Of course, you have to understand in his testimony that he

is hoping he is going to save himself from the electric chair. It is the human reaction. It is natural for him to hope that *but he told you, and I can tell you, there has been no promise.*" (Emphasis supplied.)

In April, 1982, however, it came to light from another attorney who spoke to former district attorney Fred Hasty at a meeting of Georgia criminal defense lawyers that Maree may in fact have had an agreement with the state. Hasty thereafter swore to the following by affidavit:[3]

"3. Prior to the trial of John Smith, I offered John Maree, the only known eyewitness to the crime, sentences of life imprisonment in exchange for testimony against John Smith and Rebecca Smith/Machetti. Mr. Maree agreed to testify against both John and Rebecca Smith in exchange for sentences of life imprisonment. I further told John Maree that I would seek the death penalty against him if he did not testify in the trials of John Smith and Rebecca Smith/Machetti. After the trials, John Maree was in fact permitted to plead guilty and did receive sentences of life imprisonment for his role in the Akins murders.

"4. Both Don Thompson and Chief Deputy Sheriff Ray Wilkes knew prior to the trial of John Smith of the agreement under which John Maree would receive life sentences in exchange for his testimony against John Smith and Rebecca Smith/Machetti.

"5. I have never informed any attorneys representing Mr. Smith in state or federal post-conviction proceedings of this agreement.

"6. At a conference of Georgia criminal defense lawyers held in late April, 1982, upon being questioned, I mentioned the fact of this agreement to another defense lawyer whom I have known for a number of years. He asked me certain details of the plea discussions with John Maree and I gave them to him.

"7. Subsequently, on May 25, 1982, I have been asked to execute this affidavit, setting forth all the facts included herein. I do so now, averring that all I set forth herein is true and accurate."

If true, and the state as yet has not met these assertions on their merits, such facts present a serious constitutional issue of prosecutorial misconduct. Napue v. Illinois, 360 U. S. 264 (79 SC 1173, 3 LE2d 1217) (1958); Giglio v. United States, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972). The facts in Napue v. Illinois are strikingly similar to this case. At Napue's trial for murder, one of his

---

[3] Fred Hasty was the prosecutor at Smith's trial. He later went into the private practice of law. Smith's second habeas petition was filed thirty days after Hasty's affidavit was obtained.

accomplices, one Hamer, testified against him. Hamer was serving a 199-year sentence for his participation in the crime. At Napue's trial, Hamer testified that he had received no promise from state officers that they would assist him in obtaining a reduced sentence in exchange for his testimony. Hamer did say that a public defender had said he would try to do something for Hamer. As a matter of fact, the prosecuting attorney had promised Hamer he would seek reduction of Hamer's sentence, and later undertook to do so, but the prosecutor did nothing to correct Hamer's false testimony at Napue's trial.

The U. S. Supreme Court held that a state may not knowingly use false testimony to obtain a conviction, that this rule is applicable even where the falsity relates only to the credibility of the witness, that the prosecutor's failure to correct the testimony of the witness which the prosecutor knew to be false denied the defendant due process of law in violation of the Fourteenth Amendment, and that the fact that the jury knew that the witness testifying falsely had an interest in testifying against the defendant (he hoped the public defender could get his sentence reduced) did not turn a tainted trial into a fair trial. The court said (360 U. S. at 269): "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." The Court went on to say (360 U. S. at 270): "Had the jury been apprised of the true facts, however, it might well have concluded that Hamer [Maree] had fabricated testimony in order to curry the favor of the very representative of the State who was prosecuting the case in which Hamer [Maree] was testifying, for Hamer [Maree] might have believed that such a representative was in a position to implement (as he ultimately attempted to do) any promise of consideration."

The state, as stated above, did not meet petitioner's false testimony claim on its merits, but defended on the ground of waiver, contending that, with due diligence, the defense could have ascertained the necessary information, and thus that the grounds for relief could "reasonably have been raised in the original or amended petition." OCGA § 9-14-51 (Code Ann. § 50-127), supra. The state urges that when, shortly after the trials, Maree in fact pleaded guilty in exchange for a life sentence, Smith and his lawyers should have made further inquiry of Maree and his attorney. This was not done. Nor has the state shown that Maree would have admitted his alleged perjury had he been asked by defense counsel.

The state's argument overlooks the thrust of Napue v. Illinois, supra, 360 U. S. at 269; and Giglio v. United States, supra, 405 U. S. at 153-54. It is not so much that Maree testified falsely, but that the

state, by allowing this knowingly false statement to stand uncorrected deprived the defendant of a fair trial. Since the prosecution has the constitutional duty to reveal at trial that false testimony has been given by its witness, it cannot, by failing in this duty, shift the burden to discover the misrepresentation after trial to the defense. The defendant has a right to rely on the accuracy of the trial testimony of the state's witness where the truth or falsity of his testimony is peculiarly within the knowledge of the state and the state is under a duty to reveal false testimony. Thus, we find unpersuasive the state's argument that the defendant should have discovered the state's breach of duty. As was said in *Williams v. State,* 250 Ga. 463, 466 (298 SE2d 492) (1983): "The state urges that the defendant should have done more than he did to protect himself. We find that the state should have done more than it did to protect the defendant's rights." See also Price v. Johnston, 334 U. S. 266, 286 (68 SC 1049, 92 LE 1356) (1948).

We, therefore, hold that Smith has alleged facts, supported by affidavits, sufficient to satisfy the requirements of OCGA § 9-14-51 (Code Ann. § 50-127) to entitle him to a hearing on the merits of his false testimony claim; i.e., petitioner has shown grounds for relief which could not reasonably have been raised in his original habeas petition. The habeas court erred in dismissing Smith's Napue-Giglio claim, and we remand this case for a hearing on the merits of this issue. *Smith v. Garner,* supra, 236 Ga. 81.

*Judgment affirmed in part; reversed in part and case remanded. All the Justices concur.*

DECIDED MARCH 1, 1983.

*Robert C. Glustrom, August F. Siemon III, Jack Greenberg, James M. Nabrit III, Joel Berger, John Charles Boger, Deborah Fins, James S. Liebman, Anthony G. Amsterdam,* for appellant.

*Michael J. Bowers, Attorney General, Susan V. Boleyn, Assistant Attorney General,* for appellee.