S89A0241. FLEMING v. ZANT.
(386 SE2d 339)

CLARKE, Presiding Justice.

We granted this appeal from the denial of a petition for habeas corpus in order to consider the impact of the 1988 amendment to OCGA § 17-7-131 on the validity of Son Fleming's death sentence.[1] For the reasons that follow, we conclude that the new statute reflects a societal consensus against the execution of mentally retarded defendants. Executing a mentally retarded defendant would therefore constitute cruel and unusual punishment prohibited by the Georgia Constitution. We remand this case for a determination of whether Fleming has presented sufficient evidence to warrant a jury trial on the issue of mental retardation.

In 1977, Son Fleming and two other defendants were convicted of murdering a police officer. Fleming was sentenced to death. In the action below, he alleged that newly discovered evidence demonstrates that he is mentally retarded.[2] This evidence indicated that in 1966 Fleming suffered gunshot wounds and applied for Social Security disability benefits. He was declared totally disabled and awarded benefits. Documents from his Social Security file indicate that the basis for the disability determination was not the gunshot wounds, but rather the evidence that he was mentally retarded, organically brain damaged and psychotic. Because he was unable to handle his financial affairs, his wife was made the payee for his benefits. He continued to receive benefits until he was incarcerated for murder.

In 1988 the legislature passed an amendment to OCGA § 17-7-

---

[1] Fleming attempts to raise several other issues in this petition. We limit our review to an examination of the impact of the newly amended statute on the validity of Fleming's death sentence because this is the only issue that has not been previously decided and could not reasonably have been raised in Fleming's previous petitions for habeas corpus. See OCGA § 9-14-51; *Smith v. Zant,* 250 Ga. 645 (301 SE2d 32), cert. denied 464 U. S. 807 (1983).

[2] The documents declaring Fleming to be mentally retarded, etc., were not discovered by his attorneys until recently. They had been in his Social Security file labeled as follows: This communication should be made part of the patient's file. Under no circumstances should the report be read or given to the patient.

131. Under the amended statute, the jury in a capital trial must decide at the time of the trial on guilt or innocence of the defendant whether the defendant is "guilty but mentally retarded." OCGA § 17-7-131 (c) (3). If the defendant is found to be guilty but mentally retarded, "the death penalty shall not be imposed and the court shall sentence the defendant to imprisonment for life." OCGA § 17-7-131 (j). The amendment is to be effective "in the trial of any case in which the death penalty is sought which commences on or after July 1, 1988." Id. On its face the statute does not apply to Son Fleming, who was tried more than ten years ago.

1. Fleming contends that, in spite of the language in the statute giving it prospective application, constitutional guarantees of due process and equal protection require that the statute be given retroactive effect. He argues that the distinction between those cases that have been tried and those that have not is arbitrary and capricious: it discriminates without rational basis between Fleming and other equally culpable mentally retarded defendants in violation of due process and equal protection. We disagree.

According to Fleming's argument, the legislature could never enact a statute that would ameliorate or repeal a prior sentencing provision unless the new law were given retroactive effect. The Constitution contains no such requirement. See *United States v. Sorondo*, 845 F2d 945 (11th Cir. 1988). Where a criminal statute does not discriminate on racial grounds or against a suspect class, equal protection and due process concerns are satisfied if the statute bears a "reasonable relation to a proper legislative purpose" and is "neither arbitrary nor discriminatory." *United States v. Holmes*. 838 F2d 1175, 1177 (11th Cir. 1988) (quoting *Nebbia v. New York*, 291 U. S. 502, 537 (54 SC 505, 78 LE 940) (1934)).

The amendment to OCGA § 17-7-131 does not improperly discriminate among classes of defendants. It distinguishes between cases that have been tried and those that have not. This classification is neither arbitrary nor discriminatory. The legislature had to choose some effective date. And, although the legislature certainly could have selected another effective date, such as the date of the offense or the date of sentencing, our responsibility is not to determine whether the legislature selected the best of possible alternatives, but rather to decide whether the legislative decision is a rational one. *Holmes*, supra, at 1178. We conclude that it is. The classification bears a reasonable relationship to a legitimate legislative concern for the finality of criminal convictions. Thus, we conclude that Fleming's equal protection and due process claims are without merit.

2. Fleming next argues that the passage of the amended statute renders his death sentence disproportionate under OCGA § 17-10-35 (c) (3). He argues that no case will again come before this Court for

direct review of a death sentence imposed on a mentally retarded person. He says that his sentence is therefore disproportionate to that imposed against similar defendants in similar cases in Georgia.

OCGA § 17-10-35 (c) (3) does not require this Court to undertake a de novo proportionality review whenever new information about the defendant is discovered or whenever a new legislative enactment changes the penological landscape. We do not reach the issue of whether there may be some circumstances under which a second proportionality review would be appropriate. It clearly would not be proper, however, to undertake a proportionality review of Fleming's case at this time. This is true because there has been no judicial determination that Fleming is mentally retarded. If he is not, there is no reason to conduct a second proportionality review. If he is retarded, our holding in Div. 3, below, is sufficient to correct any proportionality problem.

3. Fleming next argues that his sentence violates the guarantee against cruel and unusual punishment found in the Eighth Amendment to the U. S. Constitution and in Art. I, Sec. I, Par. XVII of the Constitution of Georgia of 1983.

Both the Georgia and the federal constitutions categorically prohibit inflicting cruel and unusual punishments. A punishment is cruel and unusual if it " '(1) makes no measurable contribution to accepted goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime.' " *Wyatt v. State*, 259 Ga. 208, 209 (378 SE2d 690) (1989)(quoting *Coker v. Georgia*, 433 U. S. 584 (97 SC 2861, 53 LE2d 982) (1977)). Further, the constitutional standard reflects society's view of what punishments are cruel, and prohibits those that "disgraced the civilizations of former ages, . . . mak[ing] one shudder with horror to read them." *Dutton v. Smart*, 222 Ga. 35 (148 SE2d 396)(1966); *Whitten v. State*, 47 Ga. 297 (1872). In other words, whether a particular punishment is cruel and unusual is not a static concept, but instead changes in recognition of the " 'evolving standards of decency that mark the progress of a maturing society.' " *Penry v. Lynaugh*, 492 U. S. ___ , at ___ (109 SC 2934, at 2953, 106 LE2d 256) (1989) (quoting *Trop v. Dulles*, 356 U. S. 86, 101 (78 SC 590, 2 LE2d 630) (1958) (plurality opinion)).

To ascertain how society currently views a particular punishment, this court, like the U. S. Supreme Court, considers objective evidence. Such evidence may include information gathered from polls or studies, data concerning the actions of sentencing juries, etc. See, id., 109 SC at 2953. However, legislative enactments constitute the clearest and most objective evidence of how contemporary society views a particular punishment. Id. Those enactments may change from time to time and as they do those changes amount to evidence

of the shifting or evolution of the societal consensus.

In *Penry v. Lynaugh*, supra, the United States Supreme Court decided that the execution of mentally retarded people is not "at present" prohibited by the Eighth Amendment to the U.S. Constitution. *Penry*, 109 SC at 2955. This decision was based in great part on the absence of any "national consensus" against executing the mentally retarded. In contrast, the objective evidence indicates that a consensus against execution of the mentally retarded does exist among Georgians.

Recently, the Georgia Senate passed a resolution urging the Board of Pardons and Paroles to give special consideration to commuting the sentences of mentally retarded offenders that had been sentenced to death, citing the poll and stating, ". . . executing a retarded offender destroys public confidence in the criminal justice system." Senate Resolution 388. Further, this state's elected representatives, voicing the will of the electorate, have spoken on the subject and have declared that if a defendant is found to be mentally retarded, "the death penalty shall not be imposed and the court shall sentence the defendant to imprisonment for life." OCGA § 17-7-131 (j). The legislative enactment reflects a decision by the people of Georgia that the execution of mentally retarded offenders makes no measurable contribution to acceptable goals of punishment.[3] Thus, although there may be no "national consensus" against executing the mentally retarded, this state's consensus is clear.

The "standard of decency" that is relevant to the interpretation of the prohibition against cruel and unusual punishment found in the Georgia Constitution is the standard of the people of Georgia, not the national standard. Federal constitutional standards represent the minimum, not the maximum, protection that this state must afford its citizens. *Harris v. Duncan*, 208 Ga. 561 (67 SE2d 692) (1951). Thus, although the rest of the nation might not agree, under the Georgia Constitution, the execution of the mentally retarded constitutes cruel and unusual punishment.

This holding does not mean that the Georgia Constitution prohibits execution of retarded persons per se. We merely hold that it prohibits cruel and unusual punishment. Our conclusion that the societal consensus in Georgia opposes execution of retarded persons does not mean that such consensus may not change thus altering what comes within the meaning of cruel and unusual punishment.

---

[3] Because opinion polls may produce widely varying results, we do not rely on polls to establish a societal consensus. We note, however, that a Georgia poll found that while 75% of Georgians favor capital punishment, 66% oppose the death penalty for the retarded, 17% favor the death penalty for the retarded, and 16% feel that their answer would depend on how retarded the person is. See Penry, 109 SC at 2955.

4. Having so decided, we must now apply the Georgia constitutional standard to the case at hand. As noted above, there has been no judicial determination that Fleming is mentally retarded. We must therefore decide by what procedure that determination will be made.

When a defendant who was tried before the effective date of the OCGA § 17-7-131 (j) alleges in a petition for habeas corpus that he or she is mentally retarded, the habeas corpus court must first determine whether the petitioner has presented sufficient credible evidence, which must include at least one expert diagnosis of mental retardation, to create a genuine issue regarding petitioner's retardation.[4] The court, in its discretion, may hold a hearing on the issue, or may make the determination based on affidavits, depositions, documents, etc. If, after examining the evidence, the habeas corpus court finds that there is a genuine issue, a writ shall be granted for the limited purpose of conducting a trial on the issue of retardation only. This trial shall be held in the court in which the original trial was conducted. Petitioner shall be entitled to a full evidentiary hearing on the issue of retardation. The determination shall be made by a jury using the definition of retardation enunciated in the statute. See OCGA § 17-7-131 (a) (3). The petitioner will bear the burden of proving retardation by a preponderance of the evidence. The jury shall not be bound by the opinion testimony of expert witnesses or by test results, but may weigh and consider all evidence bearing on the issue of mental retardation. If the jury returns a verdict that the petitioner is mentally retarded, the petitioner's sentence shall be vacated and he shall be sentenced to life imprisonment.

In summary, we conclude that the execution of mentally retarded offenders violates the Georgia constitutional guarantee against cruel and unusual punishment. We reverse the judgment of the court below to the extent that it held otherwise. In all other respects the judgment below is affirmed.

*Judgment affirmed in part, reversed in part and remanded. All the Justices concur, except Marshall, C. J., and Smith, J., who dissent as to Divisions 3 and 4 and the reversal and remand.*

SMITH, Justice, dissenting.

I dissent for several reasons. First, I believe that the legislature intended for OCGA § 17-7-131 to be prospective only. Second, I do not believe that there is a consensus among the people of Georgia that *all* mentally retarded criminal defendants under *all* circumstances should be excused from the death penalty. Moreover, I do not believe that the legislature intended for the Georgia Constitution to be used

---

[4] The procedure is remedial in nature and will not apply to defendants tried after the effective date of the statute.

to excuse *all* mentally retarded criminal defendants from the death penalty regardless of the degree of their retardation, blameworthiness, or involvement in crimes past, present, or future.[1]

When we granted Son Fleming's application, we directed the parties to address "The impact of the 1988 amendment (Ga. Laws 1988, p. 1003 et seq.) to O.C.G.A. § 17-7-131 on the validity of Fleming's sentence of death." For the reasons below, I agree with the habeas court that OCGA § 17-7-131 has prospective application only and has no direct application to Mr. Fleming's death sentence for the murder of Ray City Police Chief James E. Giddens. See *Fleming v. State*, 240 Ga. 142 (240 SE2d 37) (1977), and *Fleming v. State*, 243 Ga. 120 (252 SE2d 609) (1979).

## THE LEGISLATURE ACTS WITH KNOWLEDGE OF THE EXISTING LAWS

The legislature is presumed to act with knowledge of the laws and the holdings of the appellate courts of this State. The pertinent laws and holdings are as follows: "Laws prescribe only for the future; they cannot . . . have a retrospective operation." OCGA § 1-3-5.

> It is a general rule, in the interpretation of statutes, that they are to be so interpreted, that they shall not affect any case that was in existence before their passage, unless they expressly, or, by necessary implication, mention that case. [*Bond v. Munro*, 28 Ga. 597, 601 (1859).]

*Kingsbery v. Ryan*, 92 Ga. 108 (17 SE 689) (1893). With knowledge of the above, the legislature specifically limited the applicability of the statute to "the trial of any case in which the death penalty is sought which commences on or after July 1, 1988. . . ." OCGA § 17-7-131 (j). The legislative intent was expressly stated. The statute was intended to apply only to those cases tried after July 1, 1988.

The legislature articulates the will of the people when it enacts laws. The judiciary interprets the laws articulated. Attempts by the judiciary to articulate the will of the people are attempts to usurp legislative power. As stated by the majority, "legislative enactments constitute the clearest and most objective evidence of how contemporary society views a particular punishment." The "clearest and most objective evidence" of the people's will is the express limitation in the statute. The statute does not apply to cases in which the accused was

---

[1] It is important to note that the death penalty in Georgia is reserved for only those who kill other humans and who also engage in acts that the people of this state find the most repugnant. Except in cases of aircraft hijacking or treason the jury must find at least one aggravating circumstance. See OCGA § 17-10-30.

found guilty and sentenced to death prior to July 1, 1988.

The majority found that the legislative decision is a rational one that is neither arbitrary nor discriminatory. That decision expresses the will of the people. It expresses the people's legitimate concern for finality. It is not this Court's prerogative to determine social policies; the power to determine policy questions rests in the legislative branch, not the judicial branch. Today's holding not only usurps the legislative power, it also ties the hands of the General Assembly. Despite the majority's insistence in Division 1 of its opinion that this Court's

> responsibility is not to determine whether the legislature selected the best of possible alternatives, but rather to decide whether the legislative decision is a rational one[,]

it has determined that the legislature has *not* selected the best alternative. Not only has the majority selected what it determines to be the best alternative, it has held that the "best alternative" must be a "constitutional alternative."

## SENATE RESOLUTIONS ARE NOT THE WILL OF THE PEOPLE

Senate Resolution 388 does not express the will of the people. Hundreds of Senate resolutions are passed each session to provide commendations to specific people, groups, and entities. For example, some of the Senate resolutions passed in 1988, closest in number to S. R. 388, included the following: S. R. 385 commended a high school wrestling team; S. R. 387 expressed regret at the passing of a citizen; S. R. 389 commended a citizen for long and distinguished service to the state; S. R. 390 expressed sympathy at the passing of a citizen. These types of Senate resolutions are political. Often only the captions are read to the Senate for a vote, and many times they are passed without a vote. When there is a vote, only the Senate votes. Senate resolutions do not express the will of the majority of the citizens of this State; they express the will of the Senator or Senators who introduced them.

The highest and best expression of the people's will is a statutory enactment. The majority's reliance on Senate Resolution 388 to determine the will of the people is an attempt to nullify and overrule the expressed legislative intent to limit the statute to only those cases tried after July 1, 1988.

## SURVEYS DO NOT SPEAK FOR THE CITIZENS

Surveys or public opinion polls do not speak for the citizens of this State; only the legislature has that power. Survey responses re-

flect waves of emotion. They often change as quickly in one direction as the other.[2] Polls may have a place in the political arena, but they prove nothing more than the mood of the respondents at a particular moment in time.

## THE LIMITATION EXPRESSES THE CONSENSUS OF THE PEOPLE

Faced with the express limitation in OCGA § 17-7-131 (j), the majority looked to Senate Resolution 388 (and by footnote to a survey) to find that there is "a consensus against execution of the mentally retarded" in Georgia. If there really is a consensus, then the General Assembly would have sought to amend the constitution to protect all mentally retarded criminal defendants. At the very least, it would have expressly stated that the statute was intended to apply to all mentally retarded criminal defendants, not only those tried after July 1, 1988. The decision to limit the statute to those tried after July 1, 1988 expresses the consensus of the people. The people's will has been nullified and overruled by the majority's reliance on Senate Resolution 388 and the survey.

## THE FIRST LEGISLATIVE ENACTMENT SHOULD NOT BE USED AS A SPRINGBOARD TO EXCUSE ALL MENTALLY RETARDED CRIMINAL DEFENDANTS

Our statute was amended in an emotional response to the execution of a mildly retarded defendant.[3] This is a new area of law. We are just beginning to understand mental retardation; we should not tie the hands of the legislature. Without a clear mandate from the people, the majority has jumped over the very first legislative enactment in this area and declared that *all* mentally retarded criminal defendants, past, present, and future, are relieved from the death penalty under the Georgia Constitution.

---

[2] The timing of the poll can create differences in the attitudes of those who respond. According to the amicus, the survey was made after the highly publicized execution of an allegedly mildly retarded criminal defendant. Would the survey produce different results if taken after the public becomes aware of the amicus' assertion that three mentally retarded defendants have been successful in invoking the statute and have been spared the ultimate penalty? See note 4, infra. Would it make a difference if the respondents knew that the majority of this Court has ruled that *all* mentally retarded criminal defendants are excused from the death penalty by the Georgia Constitution? Would it make a difference if the question asked was: "Should all mentally retarded criminal defendants, regardless of the degree of retardation, blameworthiness, or involvement in the crimes, be excused from the death penalty?"

[3] Five years after being convicted and sentenced to death for murder, armed robbery, aggravated assault, and burglary, *Bowden v. State*, 239 Ga. 821 (238 SE2d 905) (1977), the defendant offered "newly discovered" evidence of his "mild retardation." *Bowden v. State*, 250 Ga. 185 (296 SE2d 576) (1982).

The majority opinion prevents the General Assembly from amending the statute. The interpretation placed upon the statute by the majority of this Court is an "integral part of the statute[,]" *Gulf C. & S. F. R. Co. v. Moser*, 275 U. S. 133, 136 (48 SC 49, 72 LE 200) (1927), and the majority's interpretation "puts the words in the statute as definitely as if it had been amended by the legislature." *Winters v. New York*, 333 U. S. 507, 514 (68 SC 665, 92 LE 840) (1948). See also *Jones v. Swett*, 244 Ga. 715, 717 (261 SE2d 610) (1979), citing with approval *Walker v. Walker*, 122 Ga. App. 545, 546 (178 SE2d 46) (1970), citing with approval *Gulf C. & S. F. R. Co. v. Moser*, supra, and *Winters v. New York*, supra. Because of the majority's holding, the statute has now been amended to state: "Executing a mentally retarded defendant [constitutes] cruel and unusual punishment prohibited by the Georgia Constitution." Majority p. 687.

The statute relieves any criminal defendant from the death penalty if he fits within the "medically accepted" definition of mental retardation adopted by the statute. Mental retardation per se should not be the determining factor in relieving a criminal defendant from the death penalty. Over time, the "medically accepted" definition might have proven to be unworkable or undesirable as it relieves *all* those who fit within the definition. The degree of retardation is not relevant, and there is no requirement that the defendant be unable to appreciate the nature and quality or the wrongfulness of his conduct.

Prior to the majority interpretation, the legislature could have amended the statute (to provide protection, for example, to only those mentally retarded criminal defendants who need protection, rather than blanket protection for every mentally retarded criminal defendant) with a vote of the legislative body; however, after today there can be no valid statutory amendment. Because of the statute's constitutional eminence, a constitutional amendment is required.

If a majority of the people in Georgia inform their representatives in the General Assembly that they do not want the Georgia Constitution to be used to relieve *all* mentally retarded criminal defendants from the death penalty, the General Assembly can only do one of two things, both of which involve long time commitments. First, the General Assembly can propose an amendment to the Georgia Constitution; or second, it can attempt to enact a new statute exempting only certain mentally retarded criminal defendants (for example, those whose retardation prevents them from being able to appreciate the nature and quality or the wrongfulness of their conduct, or those whose involvement in the crime was limited or coerced because of their retardation) from the death penalty. The new statute will be challenged by the first mentally retarded criminal defendant who is no longer relieved from the death penalty. Because "[l]egislative acts in violation of [our] Constitution . . . are void, and the judiciary shall

so declare them[,]" Art. I, Sec. II, Par. V of the Constitution of Georgia of 1983, this Court will have to declare the newly enacted statute void; it will conflict with the cruel and unusual provision of the Georgia Constitution. Once the statute has been declared void, a majority of this Court, relying on today's majority opinion, will look to the void statute, a senate resolution, and public opinion polls and declare that the consensus has changed.

The majority should not have found a consensus without a very clear message from the legislature. The message is not clear today, and there are far less drastic methods which could have provided adequate protection to Mr. Fleming and others who may be mentally retarded.

## THE BREADTH OF THE HOLDING

Today's constitutional holding may extend protection to those who neither need nor deserve protection. The majority opinion presumes that *no* mentally retarded criminal defendant, regardless of the degree of retardation, could ever act with that degree of blameworthiness associated with the death penalty.

In Georgia, a criminal defendant is mentally retarded if he has:

[S]ignificantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period. [OCGA § 17-7-131 (3).]

According to Ellis and Luckasson:

General intellectual functioning is a phenomenon measured, and thus defined, by intelligence tests. It is, therefore, quantifiable as an intelligence quotient (IQ) score. The AAMD's definition sets the upper boundary of mental retardation at an IQ level of 70, which is approximately two standard deviations from the mean score of 100. [Cit.] For an individual to be classified as mentally retarded, the deficit in intellectual functioning must be accompanied by impairments in adaptive behavior defined as "significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected from his or her age level and cultural group, as determined by clinical assessment and, usually standardized scales." Thus adaptive behavior is a term of art, which is not synonymous with maladaptive behavior. The inclusion of adaptive behavior in the definition of mental retardation requires that intellectual impairment,

measured by an intelligence test, have some practical impact on the individual's life. [Cit.]

Ellis, J., and Luckasson, R., *Mentally Retarded Criminal Defendants*, 53 Geo. Wash. L. Rev. 414, 422 (1985). Given our statute and the majority's constitutional holding, all that is needed to relieve any criminal defendant from the death penalty is the following: an IQ test score of 70 or lower and an expert to testify that the defendant is mentally retarded. There is no requirement that the mentally retarded criminal defendant's retardation prevented him from appreciating the nature and quality or the wrongfulness of his conduct. There is no value attached to any experience in life, i.e., military or other training, jobs held, independent living, family reared, ability to read or write, educational background, licenses held, ability to drive a car and obey the rules of the road, or ability to obey laws generally.

## MENTALLY RETARDED INDIVIDUALS VARY IN THEIR ABILITIES

Mentally retarded people are not a homogenous group; they vary considerably in their abilities. Their experiences also vary, and mildly retarded individuals are often able to function successfully in society. A person who is mentally retarded can be any where on a continuum from independent to dependent. "Mentally retarded people are individuals. Any attempt to describe them as a group risks false stereotyping and therefore demands the greatest of caution." *Mentally Retarded Criminal Defendants*, supra, 53 Geo. Wash. at 427. According to the *Diagnostic and Statistical Manual of Mental Disorders (DSM-III-R) Third Edition-Revised* at p. 32:

There are four degrees of severity, reflecting the degree of intellectual impairment: Mild, Moderate, Severe, and Profound. IQ levels to be used as guides in distinguishing the four degrees of severity are:

| DEGREE OF SEVERITY | IQ |
|---|---|
| Mild | 50-55 to approx. 70 |
| Moderate | 35-40 to 50-55 |
| Severe | 20-25 to 35-40 |
| Profound | Below 20 or 25 |

317.00 MILD MENTAL RETARDATION

Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment of those with the disorder—about 85%. People with this level of Mental Re-

tardation typically develop social and communication skills during the preschool years (ages 0-5), have minimal impairment in the sensorimotor area, and often are not distinguishable from normal children until a later age. By their late teens they can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need guidance and assistance when under unusual social or economic stress. At the present time, virtually all people with Mild Mental Retardation can live successfully in the community, independently or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

Mildly mentally retarded individuals, about 85% of the retarded population, can live successfully in the community. Id. Those who are mildly retarded should not be excused from the death penalty under *all* circumstances.

## EXPERT WITNESSES WILL DETERMINE THE ULTIMATE ISSUE

Professionals with specialized training in psychiatry or psychology will have to determine whether the defendant is mentally retarded according to the "medically accepted" definition. A person with an IQ test score of 70 or below is classified as mentally retarded. Id. The experts will be called upon to testify, and according to our rules of evidence:

Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Cits.] [*Smith v. State*, 247 Ga. 612, 619 (277 SE2d 678) (1981).]

Because the "conclusion is beyond the ken of the average layman[,]" Id. experts will determine the ultimate issue. Once it is shown that the criminal defendant's IQ test score is 70 or below and the expert has testified that the defendant is mentally retarded, the accused has made a prima facie case and the burden shifts to the State to refute it. However, there is nothing to refute. Once it is established that the IQ test score is 70 or below and the expert testifies that one with an IQ of 70 or below is mentally retarded there is nothing that the State can do. The defendant's counsel, at this juncture, can make a motion for a directed verdict as to the defendant's retardation. The fact that

the expert could and might wish, in some cases, to also testify that the defendant's mental retardation did not prevent him from being able to appreciate the nature and quality or the wrongfulness of his conduct is irrelevant and will not be allowed. Once the expert states that the defendant is mentally retarded, the inquiry ends.

## THERE ARE FAR LESS DRASTIC METHODS AVAILABLE

The majority could call upon less extreme methods to protect Mr. Fleming. Mr. Fleming has presented "newly discovered" evidence of his retardation which raises an issue as to his mental capacity, his ability to understand the nature of the proceedings against him, and his ability to provide assistance to his counsel to aid in his defense. See Curry v. Zant, 258 Ga. 527 (371 SE2d 647) (1988). The majority need not declare all mentally retarded criminal defendants freed from the death penalty in order to protect Mr. Fleming.

## DO GEORGIANS WANT ALL MENTALLY RETARDED CRIMINAL DEFENDANTS RELIEVED FROM THE DEATH PENALTY WITHOUT REGARD TO ANY OTHER FACTORS?

Today there may be a criminal defendant who has been tried, convicted, and sentenced to death for a heinous crime. He may fit within the "medically accepted" definition of mental retardation although he may have functioned in society and, in fact, may have been integrated into society to such an extent that no one considers him unable to act with the degree of blameworthiness associated with the death penalty. His mental retardation may not have prevented him from being able to appreciate the nature and quality or the wrongfulness of his conduct. This criminal defendant may have worked for a living and supported himself, may have a driver's license, may understand and obey the rules of the road, may have a family, may know the difference between right and wrong, may understand and obey the law generally, and may have planned and carried out a heinous crime that warrants the death penalty. That criminal defendant will not receive the death penalty if he can find "newly discovered" evidence that he is mentally retarded. His degree of mental retardation, blameworthiness, or involvement in the crimes will be of no significance; he will be relieved from the ultimate penalty based solely upon the expert's testimony that the defendant is mentally retarded.

## CONCLUSION

I do not believe that there is a consensus in this State that all mentally retarded criminal defendants, regardless of their degree of retardation, blameworthiness, and involvement in capital crimes should be excused from the death penalty. I do not agree with the majority that "the people of Georgia [have decided] that the execu-

tion of mentally retarded offenders makes no measurable contribution to acceptable goals of punishment." Mental retardation per se does not prevent a person from being capable of acting with the degree of blameworthiness that is associated with the death penalty. I do not agree that we should use the Georgia Constitution to relieve all mentally retarded criminal defendants from the death penalty under all circumstances.

The majority quotes Senate Resolution 388 as follows: "executing a retarded offender destroys public confidence in the criminal justice system." I believe that excusing *all* mentally retarded criminal defendants from the ultimate punishment, regardless of the degree of retardation, blameworthiness, and involvement in the crimes, destroys public confidence in the criminal justice system.[4] For this rea-

---

[4] The amicus states: "[T]hree mentally retarded defendants who were convicted of murders . . . have already successfully invoked the provisions of the 1988 statute. . . ." The three cited are:

1) Jerome Holloway, convicted and sentenced to death for malice murder and armed robbery. *Holloway v. State*, 257 Ga. 620 (361 SE2d 794) (1987). "Holloway gained entry to the home of his mother's friend, Corabelle Berry, on the pretext of needing to borrow a cup of sugar, and proceeded to beat her to death with a stick and a kerosene lamp and to take from her residence several hundred dollars, which he used to buy stereo equipment."

2) George Elder Dungee, convicted and sentenced to death on six counts of murder for the deaths of the Alday family in Donalsonville. Five members of the family were killed as they returned to their home. "Mary Alday was then raped by two or more of the men. . . . She was then taken bound and blindfolded, in her car about six miles to a wooded area where she was raped by two of the men, was beaten when she refused to commit oral sodomy, and her breasts mutilated. She was then killed with two shots. Her watch was then removed from her nude body." *Coleman v. State*, 237 Ga. 84, 85 (226 SE2d 911) (1976). "[T]he evidence showed that [Dungee] participated in all the crimes and that he personally caused the death of Mary Alday." *Dungee v. State*, 237 Ga. 218 (227 SE2d 746) (1976).

3) Eddie Spraggins, found guilty and sentenced to death for rape and murder. The evidence showed the following: "On the afternoon of January 31, 1977, the semi-nude body of Frances Coe, age about 55, was found in her home in Manchester, Georgia. She had been repeatedly stabbed, slashed and cut, including having her throat cut. There were several wounds to the body which caused the victim to bleed heavily, with the most severe stab wounds being in the upper abdomen and lower chest, including two in the upper abdomen which penetrated the heart. She had been partially disembowelled. Death was attributed to a loss of blood." There was also evidence of sexual abuse. *Spraggins v. State*, 240 Ga. 759 (243 SE2d 20) (1978).

Today this Court, in reliance on the majority opinion, has remanded Eli Beck's case to the trial court for a jury trial on the issue of mental retardation. Eli Beck was convicted and sentenced to death for malice murder, armed robbery, and burglary. Beck and his co-defendant went to the house of their former employer and shot and killed him. "It is clear, however, that Beck . . . entered the victims' home intending to kill. Not only were they armed, but, significantly, they wore socks on their hands so there would be no fingerprints, but they did *not* wear masks, notwithstanding that both victims knew Beck. . . ." *Beck v. State*, 255 Ga. 483, 486 (340 SE2d 9) (1986). Because of today's holding, the fact that the murder was planned and that Beck attempted to conceal the crime by wearing socks on his hands so that there would be no fingerprints would have no significance if Beck can produce an IQ test score of 70 or less.

I cannot believe that the people of Georgia intended for the Georgia Constitution to prevent all of those criminal defendants who have been sentenced to death to be excused

son and those stated above, I dissent.

I am authorized to state that Chief Justice Marshall joins in this dissent.

DECIDED DECEMBER 1, 1989 —
RECONSIDERATION DENIED DECEMBER 20, 1989.

*Paul, Hastings, Janofsky & Walker, Kenneth Shapiro, Mark E. Olive, Gary A. Alexion, Benna Kushlefsky,* for appellant.

*Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Senior Assistant Attorney General,* for appellee.

*Bondurant, Mixon & Elmore, Emmet J. Bondurant,* amicus curiae.

from the death penalty based upon an IQ test score of 70 or below.